☐ Original          ☐ Duplica



CLERK'S OFFICE
A TRUE COPY
Nov 19, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The person of Jared Carlson (W/M DOB: XX/XX/1982) and<br>Carlson's cell phone bearing phone number (920) 217-5345,<br>and any other device in his possession that previously bore<br>that phone number, described on Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.   24-M-536 (SCD) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     12-3-24     _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Stephen C. Dries _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     11-19-24. 9:25 am _____          *Stephen C. Dries* (signature)
                                                                                                      *Judge's signature*

City and state:     Milwaukee, Wisconsin _____          Stephen C. Dries, U.S. Magistrate Judge
                                                                                                      *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

***Person and Property to be Searched***

1. The person of JARED CARLSON (W/M, DOB: XX/XX/1982).

2. CARLSON's cellphone bearing phone number (920) 217-5345, and any other device in his possession that previously bore that phone number.

The **Device** is currently located in the possession of JARED CARLSON. The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

### *Particular Things to be Seized*

1.      The cellphone, including records and information stored on the **Device,** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance); 846 (Conspiracy to Distribution and Possession with Intent to Distribute a Controlled Substance); and 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance) involving Jared CARLSON and Jessica FRIDAY since January 1, 2019 including:

   a.   Preparatory steps taken in furtherance of this crime;

   b.   Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

   c.   All voicemail and call records;

   d.   All text messages and call history;

   e.   Contact list, to include names, addresses, phone numbers, and/or email addresses;

   f.   All social media sites used and applications for social media sites;

   g.   Evidence of health care provided by Jessica FRIDAY

   h.   Types, amounts, and prices of controlled substance transactions as well as dates, places, and amounts of specific transactions;

   i.   Any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information); and,

   j.   All bank records, checks, credit card bills, account information, and other financial records.

   k.   Evidence of compensation, gifts and/or favors exchanged between Jared CARLSON and Jessica FRIDAY

l. All internet activity;

m. All location data including from the phone and/or from any downloaded applications;

2. Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Device**.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of JARED CARLSON to the fingerprint scanner of the device; (2) hold a device found in front of the face of JARED CARLSON and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

2

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3

CLERK'S OFFICE
A TRUE COPY
Nov 19, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The person of Jared Carlson (W/M: DOB: XX/XX/1982) and Carlson's cell phone bearing phone number (920) 217-5345, and any other device in his possession that previously bore that phone number, described on Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br> Case No. 24-M-536 (SCD) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1), 846, and 843(b) | Distribution & Possession and Conspiracy to Distribute a Controlled Substance; Possession with Intent to Distribute a Controlled Substance; Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.



*Applicant's signature*

Tyler Owenby, Special Agent - DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means)*.

Date: 11-19-24

*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kerrianne Sundberg, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND INVESTIGATOR BACKGROUND

1.      I make this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search warrant authorizing the search of a person, and the extraction of evidence from that person of electronically stored information as described in Attachment B.

2.      I am a Diversion Investigator with the Drug Enforcement Administration ("DEA"). I have been so employed since January 2019 and am currently assigned to the DEA Milwaukee District Office.  As part of my duties as a DEA Diversion Investigator, I investigate criminal violations involving Title 21, United States Code, and Title 21, Code of Federal Regulations, Part 1300 et seq. In my capacity as a Diversion Investigator, I have conducted and participated in investigations of practitioners, pharmacies and individuals involved in diversion, that is, the unlawful distribution and acquisition of pharmaceutical controlled substances. I am familiar with the usual methods of investigation, including but not limited to, conducting audits, the questioning of witnesses, the use of informants, undercover operations and the review of social media platforms and phone records for communication.

3.      I have participated in complex investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1) and 843(a)(3).

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses, DEA records, and records and information received from other parties, such as victims and

pharmacists. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that Jessica FRIDAY was involved in the unlawful distribution of controlled substances outside the scope of normal medical practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1) and 843(a)(3) (to acquire possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge). Based on the facts set forth in this affidavit, there is probable cause to believe that Jared CARLSON was involved in the unlawful distribution of controlled substances and has violated Title 21, United States Code, Sections 841(a)(1)(Distribution and Possession with Intent to Distribute a Controlled Substance); 846 (Conspiracy to Distribute and Possession with Intent to Distribute a Controlled Substance); and 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance) and that evidence of this crime can be found in the Device as described in Attachment A. The particular evidence to be seized from the Device is described in Attachment B.

**PERSON AND PROPERTY TO BE SEARCHED**

6.     The person of Jared CARLSON (DOB: XX/XX/1982).

7.     The property to be searched is the cellphone bearing the phone number of (920) 217-5345 and any other cellular device in CARLSON's possession that was previously assigned that number, belonging to Jared CARLSON. The Device is currently in the possession of Jared CARLSON.

8.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

2

**PROBABLE CAUSE**

9.      I am conducting an investigation of Jessica Friday ("FRIDAY"), for her suspected involvement in the unlawful distribution of controlled substances outside the scope of normal medical practice and not for legitimate medical purposes, in violation of Title 21, United States Code, Section 841(a)(1), and acquiring possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, in violation of Title 21, United States Code, Section 843(a)(3).

10.      FRIDAY is a Mid-Level Practitioner (Nurse Practitioner) licensed to practice medicine in the state of Wisconsin. FRIDAY maintains DEA Registration Number MF5105146, registered at 3815 Stoney Creek Court, Appleton, Wisconsin 54913, which authorizes FRIDAY to issue Schedules II-V controlled substance prescriptions in Wisconsin. Investigation in this case has revealed the aforementioned address is FRIDAY's home address. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation and my review of: (a) records pertaining to DEA Registration MF5105146 (b) Wisconsin Prescription Drug Monitoring Program ("PDMP") records (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (d) information obtained from cooperating citizen witnesses.

11.      Pursuant to Title 21, United States Code, Section 841(a)(1) and Title 21, Code of Federal Regulations, Section 1306.04(a), the distribution of controlled substances is unlawful unless the controlled substances are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. The practitioner is responsible for the proper prescribing and dispensing of controlled substances. Based on

3

information received from individuals, prescribing databases and prescription images, there is probable cause to believe that FRIDAY has issued controlled substance prescriptions, and continues to prescribe controlled substances outside of the usual course of professional practice, and that she issued controlled substance prescriptions to at least one patient (Jared CARLSON) with an agreement that she would receive a portion of the controlled substances back from the Jared CARLSON once the prescription was filled at the pharmacy.

***Background***

12.     FRIDAY became registered with the DEA in January 2019. FRIDAY maintained Wisconsin Registered Nurse (license 222309-30) and Advanced Practice Nurse Practitioner (license 8937-33) licenses which were both regular and active with no disciplinary orders documented. FRIDAY's Advanced Practice Nurse Prescriber license listed a specialty in Family Practice.

13.     FRIDAY was employed by American Telepsychiatry as a Nurse Practitioner. According to American Telepsychiatry's website, https://atelepsych.com, FRIDAY specialized in psychiatry, adult psychiatry and family practice. American Telepsychiatry's website stated American Telepsychiatry, American Behavioral Telehealthcare and American Telehealthcare were trademarks owned by Horizon Healthcare, Inc., a Wisconsin corporation organized in May 1990. American Telepsychiatry utilized telemedicine as part of their practice.

14.     Prior to American Telepsychiatry, FRIDAY was employed at Apple Medical Clinic, located in Appleton, Wisconsin. She was employed by Apple Medical Clinic from January 2019 until November 2020. This was a pain management clinic that utilized electrical therapy for pain management.

*Information Obtained from PDMP Database*

15.     As part of my investigation, I reviewed data contained within the Prescription Drug Monitoring Program, commonly referred to as "PDMP" (see Wis. Stat. §450.19). As a Diversion Investigator, I use the PDMP to review prescriptions of controlled substances issued and dispensed by DEA registrants and filled by individual persons of interest. The Pharmacy Examining Board ("PEB") governs the PDMP, and the Wisconsin Department of Safety and Professional Services ("DSPS") oversees the operation of the PDMP in accordance with the policies established by the PEB.

16.     A review of FRIDAY's PDMP records revealed the majority (approximately 63%) of the controlled substances she issued were stimulants, followed by benzodiazepines (18%). Of all the controlled substances she issued, opioids were the least (6%). Five of FRIDAY's prescriptions were for a combination of an opioid, benzodiazepine, and carisoprodol (muscle relaxer). This combination is frequently referred to as the "Holy Trinity." The Holy Trinity is a dangerous combination because it is known to depress the central nervous system and ability to breathe, which causes an increased risk of overdose and death.

17.     During her employment at Apple Medical Clinic, FRIDAY issued approximately 78 controlled substance prescriptions to approximately Fifteen (15) different individuals. Included in these were prescriptions issued to individuals identified as FRIDAY's mother and stepfather. A subsequent review of records from Apple Medical revealed eight (8) of the individuals to whom FRIDAY issued controlled substance prescriptions while employed at Apple Medical were not patients of Apple Medical. FRIDAY's mother and stepmother were, for example, not patients of Apple Medical. These 78 prescriptions were either issued on Apple Medical prescription pads or electronically with Apple Medical Clinic's address listed as the clinic. As explained below, Apple

5

Medical did not use controlled substances as part of their treatment program, which means that all 78 controlled substance prescriptions issued by FRIDAY on Apple Medical prescription paper are potentially problematic.

***Controlled Substance Information***

18.     Schedule II controlled substances are those that have a "high potential for abuse" which "may lead to severe psychological or physical dependence," 21 U.S.C. §812(b)(2). Schedule II controlled substances are the most dangerous drugs that can be prescribed for medical use. See 21 U.S.C. §§812(a)(1)(B) and (C) (defining Schedule I controlled substances as having "no currently accepted medical use in treatment in the United States" and lacking "accepted safety…under medical supervision"); 21 U.S.C. §§812(b)(3)(A), (4)(A), and (5)(A) (defining controlled substances in Schedules III, IV and V as having lower potential for abuse than Schedule II controlled substances).

19.     Because Schedule II controlled substances have a high potential for abuse, Congress has enacted special statutes and regulations governing prescriptions for these drugs. For example, except in emergency situations, or when administered directly to a patient by a "practitioner," Schedule II controlled substances can be dispensed only with a "written prescription of a practitioner," 21 U.S.C. §829(a). In addition, "no prescription for a controlled substance in Schedule II may be refilled." For the distribution of a controlled substance to be authorized by law, it must be prescribed "for legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. §1306.04(a).

20.     Opioid medications such as Oxycodone and Hydromorphone are Schedule II controlled substances. Because of the dangers associated with Opioids, the Centers for Disease Control (CDC) have issued guidance related to those classes of drugs. One such set of guidance

6

documents refers to Morphine Milligram Equivalent (MME). MME measures an opioid dosage's equivalency to morphine. The CDC recommends that MME should not exceed 90 MME/day unless necessary with careful consideration and justification (www.cdc.gov).

21.     Oxycodone is a Schedule II controlled substance used to treat moderate to severe pain. It has a high risk for addiction and dependence. It can cause respiratory distress and death when taken in high doses or when combined with other substances.

22.     Hydromorphone is a Schedule II controlled substance used to treat moderate to severe pain. It has a high risk for addiction and dependence. It can cause respiratory distress and death when taken in high doses or when combined with other substances.

23.     Vyvanse is a Schedule II controlled substance, generic name lisdexamfetamine-dimesylate. Vyvanse is a central nervous system stimulant that affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Vyvanse is used to treat ADHD. Vyvanse may be habit-forming, and this medicine is a drug of abuse.

24.     Carisoprodol is a Schedule IV controlled substance used to treat pain and stiffness from muscle spasms. It is a muscle relaxer that blocks pain sensations between the nerves and the brain. Carisoprodol may be habit forming and should only be used for short periods of time.

***Complaint Information***

25.     In 2021, DEA received a complaint from Appleton Police Department.  It stated that FRIDAY was allegedly writing controlled substance prescriptions to family members, including her mother and stepfather. At the time DEA received that complaint, DEA forwarded the information to the Wisconsin Department of Safety and Professional Services ("DSPS").

26.     In January 2024, DEA received a complaint from local pharmacist, M.R., that she noticed suspicious prescribing from Jessica FRIDAY. According to M.R., FRIDAY prescribed

7

large quantities of controlled substances to patient M.H. (date of birth 07/30/1993) and M.R. felt those prescriptions may be outside the scope of FRIDAY's practice, given the quantity of opioids over a short period of time. M.R. filled oxycodone prescriptions issued by FRIDAY for M.H. beginning approximately August 2023. Around December 2023, FRIDAY increased the quantity of oxycodone tablets prescribed to M.H. In February 2024, FRIDAY increased the strength of the oxycodone prescriptions. The diagnosis FRIDAY wrote on the prescriptions was for "chronic pain syndrome" and "lower back pain." M.H. also regularly filled prescriptions for Vyvanse that were issued by FRIDAY. M.R. expressed a concern that FRIDAY worked in psychiatric medicine but was prescribing opioids.

27. In reference to M.R.'s complaint, I reviewed the PDMP records of controlled substance prescribing to M.H. According to the PDMP, between March 2022 and January 2024, M.H. filled approximately 47 controlled substance prescriptions issued by FRIDAY. Regular monthly prescriptions were filled for Vyvanse and oxycodone. The oxycodone prescriptions were initially issued for 5mg strength tablets at a quantity of 42 tablets for a seven-day supply, and increased to 20mg tablets at a quantity of 240 tablets for a 14-day supply. In the latter several months, M.H.'s oxycodone prescriptions were filled between two and four days early. M.H.'s most recent prescription MME was calculated to be 240 MME/day.

28. After receiving M.R.'s complaint, and reviewing the 2021 complaint, I obtained from various pharmacies images of prescriptions issued by FRIDAY between 2019 and 2021. The majority of these were paper prescriptions and were issued during the period FRIDAY was employed at Apple Medical Clinic. These prescriptions included those filled for the individuals identified as FRIDAY's mother and stepfather, as well as others who were not patients of Apple Medical. The images revealed Apple Medical Clinic's name and address on the top of the paper

8

prescription. Each contained the signature of "Jessica Friday." The majority of the prescriptions were hand-written. The prescriptions issued to FRIDAY's mother and stepfather included monthly oxycodone prescriptions. In March 2024, I spoke with the owner of Apple Medical Clinic, M.J. M.J. stated FRIDAY was employed at the clinic from January 2019 until November 2020. She was employed as a Nurse Practitioner with no specific specialty. The clinic was a pain management clinic that utilized electrical therapy. M.J. informed me that Apple Medical did not utilize controlled substances as part of their treatment. M.J. stated that FRIDAY often reported to work late, left work early, and took many sick days. FRIDAY was behind in completing documentation in over 1,000 patient charts and was ultimately terminated. Approximately five months after FRIDAY's termination, M.J. received multiple phone calls from a pharmacist stating he received prescriptions for controlled substances that were issued by FRIDAY on Apple Medical Clinic prescription paper. M.J. called FRIDAY on the telephone and informed her to stop using the clinic's prescription paper. M.J. believed FRIDAY took paper prescription pads from the clinic when she was terminated. M.J. stated that FRIDAY would have no need to write prescriptions for controlled substances as part of her employment with Apple Medical because Apple Medical did not utilize controlled substances for their treatment.

29.    In June 2024, I received intelligence that Fox Crossing Police Department (Wisconsin) received a complaint that FRIDAY overprescribed and diverted controlled substances. The investigator informed me that a physician contacted the police department after a patient, Jared CARLSON, expressed concerns for his safety due to being prescribed a large amount of opioids by FRIDAY, his telehealth provider. I utilized law enforcement databases to obtain CARLSON's criminal history. The review revealed CARLSON was found guilty of Disorderly Conduct (two counts), Criminal Damage to Property and Attempt Obtain a Prescription Drug with

9

Fraud in 2012; and Computer-Crime Access Data, Computer Crime-Destroy Equipment and Misappropriate ID Info-Obtain Money in 2013.

30.     In July 2024, investigators conducted a voluntary interview with CARLSON. CARLSON stated his treatment with FRIDAY began around 2021 or 2022 and he stopped seeing her approximately two months ago, after he had a conversation with his Primary Care Physician about being overprescribed controlled substances. CARLSON stated that FRIDAY prescribed pain medication for several toe surgeries. CARLSON also stated that FRIDAY treated him for Attention-Deficit-Disorder (ADD), Bipolar, and anxiety, among other conditions. CARLSON disclosed to me that he had an overdose of opioid medications several years prior.

31.     According to CARLSON, FRIDAY provided him written instructions to "pre-medicate" 15-20 minutes before their scheduled telehealth visits by taking Xanax and oxycodone.

32.     Although FRIDAY was CARLSON's telehealth provider, CARLSON indicated that he traveled to FRIDAY's residence approximately 18 times to help her with her computer, television, and sometimes to drop off controlled substance medications that she prescribed to him. CARLSON stated that he had an agreement with FRIDAY that he would provide her with half of the pain pills she prescribed to him throughout the 2023-2024 time period during which she prescribed him controlled substances.

33.     CARLSON stated that he and FRIDAY often met in the Starbucks parking lot near the pharmacy where CARLSON filled the prescriptions. In the parking lot, CARLSON would get into FRIDAY's vehicle or FRIDAY would get into his vehicle, at which point FRIDAY would count the pain pills CARLSON had just picked up from the pharmacy. FRIDAY kept half of the pain pills for herself and gave the remainder to CARLSON. FRIDAY often changed CARLSON's medications or changed the strengths of the medications. According to CARLSON, FRIDAY

10

made these changes to avoid arousing the pharmacy's suspicions about the prescriptions. Sometimes, CARLSON gave FRIDAY a portion of the Vyvanse medication she prescribed to him. CARLSON understood that FRIDAY used that medication as well. According to CARLSON, FRIDAY told CARLSON she would write him any prescription he wanted.

34.    CARLSON told investigators that he and FRIDAY used text messaging and Facebook messenger to communicate. He explained that they discussed his prescriptions and his providing FRIDAY with portions of his prescribed medications over those communication platforms. According to CARLSON, he and FRIDAY often used code words when discussing the prescriptions on Facebook and text messages. He explained that "pink" referred to 10mg oxycodone, "gray" referred to 20mg oxycodone and "white" referred to hydromorphone. CARLSON stated that FRIDAY would often remind CARLSON when it was time for a prescription refill, and that she began referring to a "yoda" to mean she wanted half of the medication she prescribed him.  CARLSON disclosed to me that he had an overdose of opioid medications several years prior.

35.    CARLSON provided documentation of the above-described Facebook messages and text messages he exchanged with FRIDAY in the form of screenshots and documents he printed. According to CARLSON, he saved only some of these messages. CARLSON informed investigators FRIDAY continues to reach out to CARLSON via phone text or Facebook messaging and CARLSON periodically communicates with her.

36.    In reviewing the documents provided by CARLSON, I observed conversations about the prescriptions FRIDAY issued to CARLSON, including discussions about the strength of prescriptions, the quantities that would be prescribed, and which pharmacy to send them to. The messages also discussed how many pills FRIDAY would receive from CARLSON. There were

11

messages in which FRIDAY asked CARLSON if he had any extra pills that she could have. In some instances, FRIDAY explained wanting the controlled substances because she had an eventful weekend coming up with hockey practice, or because she was moving. In one instance, FRIDAY referenced wanting the controlled substances because her husband or children destroyed her supply of medications.

37.     My review of the messages provided by CARLSON also revealed instances in which CARLSON suggested changes to his prescriptions. In some instances, these suggestions appeared based on a desire to avoid scrutiny by the pharmacy or a desire to "protect" FRIDAY and her license. I also observed messages in which CARLSON requested prescriptions. Although the messages did not express CARLSON's concern for his own safety, as he relayed to his primary care provider, the messages corroborated CARLSON's statements that he provided a portion of his controlled substance prescriptions to FRIDAY, that she requested he do so, and that they used coded language to refer to particular types of controlled substances.

38.     CARLSON only provided a subset of the messages between he and FRIDAY. Many of the messages he provided were not in a format that could be authenticated and admitted at trial because they were saved to and printed from an unknown source, that CARLSON represented was his electronic devices. CARLSON stated he saved messages from his phone, where the communications occurred, to his laptop computer/tablet, which is what he provided to investigators. CARLSON initially provided investigators access to his laptop where he purportedly saved the messages. Though CARLSON was initially cooperative with investigators, he has since declined to provide access to his phone so that law enforcement can obtain an authenticated version of the communications that were stored there. CARLSON has claimed he has deleted all messages he had with FRIDAY since his last communication with investigators and obtained a new phone.

12

However, CARLSON was previously instructed by law enforcement not to delete any messages. CARLSON also informed investigators he continues to communicate with FRIDAY periodically, but has declined to provide those communications.

38.     Investigators attempted to obtain the communications directly from Facebook, but CARLSON said he and FRIDAY mostly used disappearing messages when they communicated. FRIDAY's Facebook information did not contain the disappearing messages. Investigators were, however, able to find some communication between CARLSON and FRIDAY. In a Facebook messaging conversation, dated May 31, 2024, there were messages from CARLSON to FRIDAY that said "I said there was confusion this month with meds, and theirs also been manufacturer, or brand problems" and "I made that clear with PCP, not sure if she understood that but I said it. I said anything I could for your defense like that" and "Like I said, I asked they keep police completely out of it, not sure if they will." FRIDAY replied to CARLSON "Not if you implied I'm stealing." CARLSON wrote back to FRIDAY "I didn't say those words. And I mentioned that you pain problem also, and maybe need counseling. And I made sure she wrote that down. I wanted something you could try and use. After I'm clean and declared stable again…" On June 9, 2024, there were Facebook messages that appeared to be between FRIDAY and CARLSON from CARLSON's business account with messages from CARLSON including "here," and "My other account. Send a reply and I do secret" and there were messages from FRIDAY including "No screen shots of shit either" and "Which one are you making private." This example of messages does not include all messaging between CARLSON and FRIDAY that was found on FRIDAY's Facebook records.

40.     Based on the information received from CARLSON, including documentation he saved on his laptop of communications he had with FRIDAY, the Facebook messages found on

13

FRIDAY's Facebook account, and that CARLSON continues to communicate with FRIDAY but has stopped cooperating with investigators, there is reason to believe there will be communications between CARLSON and FRIDAY on CARLSON's cell phone, bearing phone number (920) 217-5345, as well as CARLSON's previous cell phone that had been linked to that number. The documentation provided by CARLSON shows he used phone number (920) 217-5345 to communicate with FRIDAY. Toll records obtained from FRIDAY's cell phone were obtained and analyzed which revealed CARLSON was one of the top numbers FRIDAY was in communication with between January 1, 2022- August 7, 2024.

41.     According to the PDMP for CARLSON between December 2021 and June 2024, he filled approximately 266 controlled substance prescriptions issued by FRIDAY, including multiple prescriptions deemed as the "Holy Trinity."

42.     Approximately 70 of the prescriptions issued by FRIDAY to CARLSON were for opioids. CARLSON filled approximately 10-15 prescriptions issued by FRIDAY each month. Those prescriptions included, but were not limited to, prescriptions for oxycodone, hydromorphone, alprazolam, diazepam, carisoprodol, lisdexamfetamine-dimesylate and pregabalin. There were numerous early fills and dosage-strength changes. The MMEs for CARLSON varied each month because the prescriptions changed. At one point, CARLSON's MME was as high as 689 MME/day.

43.     Based on my training and experience, and my review of the communications between FRIDAY and CARLSON, there is probable cause to believe that evidence of the unlawful distribution of controlled substances may likely be stored and recorded on the Device in the possession of CARLSON.

14

44. Based on my training and experience, affiant is aware that individuals involved in the illegal distribution of controlled substances frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers. Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to unlawfully obtain or distribute controlled substances.

45. Based on my training and experience, affiant believes it is common for crime suspects who possess and/or illegally distribute controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal distribution of controlled substances. Furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular and other electronic devices.

46. Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and illegal distribution of controlled substances; and (2) CARLSON's statement that messages regarding the illegal distribution of controlled substances were exchanged via text message and other messaging means, there is probable cause to believe that a search of the information contained within the above described Device will produce evidence of a crime, namely evidence related to the unlawful distribution of controlled substances. I am requesting records dating back to January 1, 2019.

**TECHNICAL TERMS**

47. Based on my training and experience, I use the following technical terms to convey the following meanings:

15

a.    Cellular telephone: A cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

16

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (GPS) consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system (GPS) technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

17

g.      Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.      IP Address: An Internet Protocol address (IP address) is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

48.      Based on my training, experience, and research, I know that the **Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all have the ability to access the internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

49.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the

18

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

50. As explained below, information stored within a cellular phone (cell phone) may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account was accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a

19

program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

51.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to search for evidence that might be found on the person of JARED CARLSON in whatever form it may be found and to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Device** was used, the purpose of its use, who used it, and when. Thus, the warrant for which I am applying would authorize the seizure of a cellphone or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).  I submit that if a cellphone is found on the person of CARLSON there is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on

20

the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

52.   *Necessity of seizing or copying entire electronic device.* In most cases, a thorough search of a target location for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from a target location, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of data either from accidental or intentional destruction. This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.   Technical Requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware

21

and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

53.     *Manner of execution.*     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the medica or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is described by the warrant.

## BIOMETRIC UNLOCK

54.     The warrant I am applying for would permit law enforcement to obtain from JARED CARLSON the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock the device subject to search and seizure pursuant to this warrant. I seek the authority based on the following:

55.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer

22

a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

56.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

57.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

58.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

23

59.     As discussed in this affidavit, based on my training and experience, I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

60.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

61.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of JARED CARLSON to the fingerprint scanner of the device; (2) hold the device in front of the face of JARED CARLSON and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

62.    Based on the above information provided in this affidavit, I believe there is probable cause that the **Device** possessed by JARED CARLSON contains evidence of violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance); 846 (Conspiracy to Distribution and Possession with Intent to Distribute a Controlled Substance); and 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance). I respectfully request a search warrant to be authorized for the search of the person of JARED CARLSON, described in Attachment A, to recover and seize evidence described in Attachment B, in any form, including his cellphone bearing phone number (920) 217-5345.

I swear under penalty of perjury that the foregoing is true and correct.

KERRIANNE SUNDBERG
Digitally signed by KERRIANNE SUNDBERG
Date: 2024.11.18 10:59:12 -06'00'

_____
Kerrianne Sundberg
Diversion Investigator, Drug Enforcement Administration

Sworn by the affiant in accordance with the requirements
of Fed. R. Crim. P. 4.1 by telephone on this __19__ day of November, 2024.

_____
STEPHEN C. DRIES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF WISCONSIN

**ATTACHMENT A**

***Person and Property to be Searched***

1. The person of JARED CARLSON (W/M, DOB: XX/XX/1982).

2. CARLSON's cellphone bearing phone number (920) 217-5345, and any other device in his possession that previously bore that phone number.

The **Device** is currently located in the possession of JARED CARLSON. The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

### *Particular Things to be Seized*

1.      The cellphone, including records and information stored on the **Device,** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance); 846 (Conspiracy to Distribution and Possession with Intent to Distribute a Controlled Substance); and 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance) involving Jared CARLSON and Jessica FRIDAY since January 1, 2019 including:

     a.  Preparatory steps taken in furtherance of this crime;

     b.  Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

     c.  All voicemail and call records;

     d.  All text messages and call history;

     e.  Contact list, to include names, addresses, phone numbers, and/or email addresses;

     f.  All social media sites used and applications for social media sites;

     g.  Evidence of health care provided by Jessica FRIDAY

     h.  Types, amounts, and prices of controlled substance transactions as well as dates, places, and amounts of specific transactions;

     i.  Any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information); and,

     j.  All bank records, checks, credit card bills, account information, and other financial records.

     k.  Evidence of compensation, gifts and/or favors exchanged between Jared CARLSON and Jessica FRIDAY

27

l.  All internet activity;

m.  All location data including from the phone and/or from any downloaded applications;

2.  Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.  Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a.  records of Internet Protocol addresses used;

b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Device**.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of JARED CARLSON to the fingerprint scanner of the device; (2) hold a device found in front of the face of JARED CARLSON and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

28

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.